ROGER CANUPP, JACOB MYERS, LAWRENCE
MCGEE, HUBERT DAVIDSON, TYWAUN
JACKSON, and CHARLES DURDEN,
individually, and on behalf of a
Class of all persons similarly
situated,

     Plaintiffs,

vs.         Case No. 2:04-cv-260-FTM-99DNF

GEORGE SHELDON, in his official
capacity as Secretary of the
Department of Children and Families,

     Defendant.
_____

## OPINION AND ORDER

   This matter comes before the Court on the Joint Motion for Approval of Settlement and Dismissal of the Case (Doc. #302) filed on November 3, 2009. Plaintiffs and Defendant, pursuant to Rule 23(e) and Rule 41(a)(2), Fed. R. Civ. P., have jointly moved the Court to approve the terms of the resolution of this action and to enter an order dismissing this action. The Court heard testimony and the argument of counsel at a hearing on November 17, 2009. For the reasons set forth below, the joint motion will be granted.

## I. Procedural History

   Plaintiffs are current or former residents of the Florida

Civil Commitment Center (hereinafter "FCCC").[1]  On May 7, 2004, plaintiffs filed a Class Action Complaint (Doc. #1) on behalf of themselves and a class of similarly situated persons.  Plaintiffs and all putative class members had been involuntarily confined to the care and custody of the State of Florida, Department of Children and Families (hereinafter "DCF"), and confined at the FCCC, pursuant to The Sexually Violent Predator Act (hereinafter the "SVPA"), §§ 394.910-394.931, Fla. Stat. (2003).  The original Defendants were the Secretary of the Department of Children and Families in his official capacity and Liberty Behavioral Healthcare Corporation (hereinafter "Liberty"), the vendor to whom DCF awarded the contract to operate and manage FCCC and its programs.  Doc. #1.

Plaintiffs' Complaint alleged that the Defendants violated Plaintiffs' constitutional and federally protected rights by: (1) failing to provide Plaintiffs with an effective sex offender treatment program that would allow them a realistic opportunity to meet the statutory requirements for release from confinement, in violation of the Fourteenth Amendment to the United States Constitution (Doc. #1, ¶¶ 157-158); (2) failing to provide Plaintiffs with appropriate mental health services that would give them an opportunity to participate in sex offender treatment and thereby be able to be released from confinement, in violation of

---

[1]Plaintiffs Roger Canupp, Jacob Myers, Lawrence McGee and Hubert Davidson are still confined in the FCCC.  Plaintiffs Charles Durden and Tywaun Jackson were released from the FCCC during the pendency of this litigation.

the Fourteenth Amendment (Doc. #1, ¶¶ 159-160); (3) failing to accommodate Plaintiffs with qualified disabilities so as to permit them to participate or receive benefits of the services, programs or activities at FCCC, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12131 et. seq. (hereinafter "ADA") (Doc. #1, ¶¶ 161-164); and (4) failing to provide appropriate procedural protections for the use of punitive confinement in violation of the Fourteenth Amendment's guarantee of procedural due process. (Doc. #1, ¶ 165.) Plaintiffs requested declaratory and injunctive relief. (Doc. #1, p. 31.)

In March 2005, the Court certified the following two subclasses of plaintiffs:

> (1) residents of the FCCC who (a) have been civilly committed to custody pursuant to §394.917, Fla. Stat., that they are sexually violent predators; or (b) have been detained to custody pursuant to §394.915 as probable cause sexually violent predators; and (c) who have consented to sex offender treatment, and are not receiving adequate sex offender treatment, and

> (2) residents of the FCCC who (a) have been civilly committed to custody pursuant to §394.917, Fla. Stat., that they are sexually violent predators; or (b) have been detained to custody pursuant to §394.915 as probable cause sexually violent predators; and (c) who have been diagnosed by a treating professional with a mental illness as defined by DSM-IV, and who are not receiving adequate treatment for their mental illness.

(Doc. #66 at 9-10.)

The parties actively engaged in extensive discovery in 2005 and 2006. Plaintiffs retained two psychiatrists: one with expertise in sex offender treatment and the other with expertise in

treatment of individuals in institutions with severe and persistent mental illness. Defendants retained a psychologist with expertise in sex offender treatment, and a psychiatrist with expertise in treating persons with severe and persistent mental illness. In 2006, Plaintiffs' experts conducted a multi-day visit to FCCC which included a tour of the facility, interviews with class members, and reviews of class member records. (Doc. #110.) Plaintiffs also conducted depositions of DCF officials and Liberty staff.

On July 1, 2006, DCF awarded the contract to operate and manage FCCC and its programs to the GEO Group, Inc. (hereinafter "GEO"), on an interim basis. As of January 1, 2007, the contract with GEO was extended to a five-year term.

Plaintiffs moved to join GEO as a Defendant (Doc. #172), and this motion was granted. (Doc. #192.) Because of the delays that would have resulted from GEO's full participation as a party, Plaintiffs filed a notice of voluntary dismissal as to GEO. (Doc. #198.) GEO was dismissed without prejudice on June 4, 2007. (Doc. #202.) As a result, George Sheldon in his capacity as Secretary of the DCF is the only Defendant in the case. GEO continues to operate FCCC under contract with DCF.

Plaintiffs' experts toured FCCC for the second time in 2007, after GEO assumed operation of the facility. After a new Case Management Report and Scheduling Order was entered on October 23, 2008 (Doc. #210), the parties once again actively engaged in discovery. After receiving leave of court, Plaintiffs conducted 24

depositions in late 2008 and early 2009.  The depositions included key DCF staff responsible for the oversight of FCCC, the FCCC director and clinical director, FCCC psychiatrists, FCCC treatment team leaders, and an FCCC contract consultant who specialized in the area of sex offender treatment.

Plaintiffs also conducted extensive document discovery. Plaintiffs' counsel and their experts reviewed the FCCC treatment records of over 200 class members.  Plaintiffs counsel reviewed all of the FCCC's operating policies since 2001, including the complete revision by FCCC of those policies in 2009; the reports of FCCC's Treatment Advisory Board and GEO's internal auditing reports of FCCC; all of DCF's contract monitoring reports of FCCC; and other DCF internal documents relating to FCCC.

Plaintiffs' experts visited FCCC for a third time in 2009. This visit lasted about three days and included a tour of the new facility that was in the final stages of completion,[2] the existing facility, interviews of more than 20 residents by each expert, and reviews of treatment records.  At the conclusion of the tour, the experts issued supplemental expert reports.  Both Plaintiffs and Defendant filed pre-trial motions seeking to limit or exclude certain areas of expert testimony.

The parties report that in early June 2009 they began discussions to resolve this case.  These discussions included

_____

[2]The new facility for the FCCC opened in April 2009.

several detailed conference calls, an extensive in-person meeting, and written exchanges. Following these discussions, the parties filed a motion seeking extension of all pre-trial deadlines and a continuance of the trial date. (Doc. #266.) The motion included a letter of commitment from Defendant Sheldon and the proposed final action plan. (Id.)

The Court granted the motion, removed the case from the trial calendar, and gave the parties 60 days to file a motion seeking approval of a settlement. (Doc. #269.) The parties subsequently filed a joint motion seeking the Court's approval of a proposed plan to notify the class, provide for objections, and to set a fairness hearing on the proposed resolution. (Doc. #272.) The Court granted the motion and ordered notice to the class by September 15, 2009. (Doc. #273.) The Court also set a deadline of October 15, 2009, for objections and set a deadline of November 2, 2009, for the parties to file a motion for approval of the settlement. (Id.)

The parties report that a copy of the notice and the settlement agreement was provided by FCCC staff to every resident of the facility by September 15, 2009. (Doc. #291, Exh. A.) In addition, a copy of the notice and the plan was posted on the bulletin board of each living unit at FCCC. Further, although not required by the Court's order, a Spanish translation of the notice and the plan was provided to each resident who speaks Spanish as a first or second language at FCCC. (Id.)

Twenty-one objections to the settlement were filed by 37 residents at FCCC. (Docs. #275-#290, #292-#296.) Many of the objections express concern about the lack of a federal monitor or court oversight for implementation of the settlement plan. Other objections seek additional relief, such as state certified vocational programs.

## II. Legal Principles

Rule 23(e) of the Federal Rules of Civil Procedure requires that a settlement, voluntary dismissal, or compromise of a certified class action be approved by the district court. Fed. R. Civ. P. 23(e). Before granting approval "the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977).[3] This determination is left to the sound discretion of the district court. In re Healthsouth Corp. Sec. Litig., 572 F.3d 854, 859 (11th Cir. 2009); In re United States Oil & Gas Litig., 967 F.2d 489, 493 (11th Cir. 1992); Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). As the Eleventh Circuit recently stated,

> [t]he district court reviews a class action settlement to determine whether it is fair, reasonable and adequate. See Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). The court considers these relevant factors: (1) the likelihood of success at trial; (2) the range of

_____

[3]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

possible recovery; (3) the point on or below the range of
possible recovery at which a settlement is fair, adequate
and reasonable; (4) the complexity, expense and duration
of litigation; (5) the substance and amount of opposition
to the settlement; and (6) the stage of proceedings at
which the settlement was achieved. Id. at 986.

In re CP Ships Ltd. Sec. Litig., 578 F.3d 1306, 1314-15 (11th Cir.

2009). See also Leverso v. Southtrust Bank, 18 F.3d 1527, 1530

(11th Cir. 1994). A court also should consider the judgment of

experienced counsel for plaintiff class. In re Dennis Greenman

Sec. Litig., 622 F. Supp. 1430, 1438 (S.D. Fla. 1985), rev'd on

other grounds, 829 F.2d 1539 (11th Cir. 1987). "Public policy

strongly favors the pretrial settlement of class action lawsuits."

In re U.S. Oil & Gas Litig., 967 F.2d 489, 493 (11th Cir. 1992).

The principles set forth in Cotton continue to apply:

> A threshold requirement is that the trial
> judge undertake an analysis of the facts and
> the law relevant to the proposed compromise. A
> "mere boiler-plate approval phrased in
> appropriate language but unsupported by
> evaluation of the facts or analysis of the
> law" will not suffice. [ ]
>
> In addition to undertaking such an analysis,
> it is essential that the trial judge support
> his conclusions by memorandum opinion or
> otherwise in the record. An appellate court,
> in the event of an appeal, must have a basis
> for judging the exercise of the trial judge's
> discretion. [ ]
>
> In determining the fairness, adequacy and
> reasonableness of the proposed compromise, the
> inquiry should focus upon the terms of the
> settlement. The settlement terms should be
> compared with the likely rewards the class
> would have received following a successful
> trial of the case. [ ] The relief sought in

the complaint may be helpful to establish a benchmark by which to compare the settlement terms. [ ]

.        .        .

Yet, in evaluating the terms of the compromise in relation to the likely benefits of a successful trial, the trial judge ought not try the case in the settlement hearings. [ ]

It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute. [ ]

Neither should it be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." [ ]

In performing this balancing task, the trial court is entitled to rely upon the judgment of experienced counsel for the parties. [ ] Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel. [ ]

In addition to examining the merits of a proposed settlement and ascertaining the views of counsel, the Court should consider other factors.

Practical considerations may be taken into account. It is often said that litigants should be encouraged to determine their respective rights between themselves. [ ] Particularly in class action suits, there is an overriding public interest in favor of settlement. [ ] It is common knowledge that class action suits have a well deserved reputation as being most complex. The

requirement that counsel for the class be experienced attests to the complexity of the class action. [ ]

.    .    .

In these days of increasing congestion within the federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources.

.    .    .

When, during the course of the litigation, it becomes known to the Court that a portion of the class objects to the proposed settlement, the trial judge must assume additional responsibilities. The trial court must extend to the objectors leave to be heard. [ ] However, this is not to say that the trial judge is required to open to question and debate every provision of the proposed compromise.

The growing rule is that the trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision.

The Court should examine the settlement in light of the objections raised and set forth on the record a reasoned response to the objections including findings of fact and conclusions of law necessary to support the response. [ ]

In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered but is not controlling. [ ] A settlement can be fair notwithstanding a large number of class members who oppose it.

The trial judge must then make a determination as to whether or not to approve the settlement, or he may make suggestions to the parties for modifications of the proposal. Approval must then be given or withheld.

Cotton, 559 F.2d at 1330-32 (internal citations omitted).

"Federal Rule of Civil Procedure 23(e)(1)(B) requires the court to provide direct notice in a reasonable manner to all class members who would be bound by the [proposed settlement]. Notice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" In re CP Ships, 578 F.3d at 1317 (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)). This requires "that the notice apprise class members of the terms of the settlement agreement in a manner that allows class members to make their own determination regarding whether the settlement serves their interests." United States v. Alabama, 271 Fed. Appx. 896, 901 (11th Cir. 2008). The right to adequate notice is also a component of the Due Process Clause of the United States Constitution. Id. at 901.

### III.  The Final Action Plan

The proposed resolution of this case is in the form of a Final Action Plan (Doc. #302, Appendix 5). The parties agree that during the pendency of this case, Defendant made numerous improvements to the treatment program at FCCC, as reflected in the current contract requirements between DCF and GEO. (Doc. #302, App. 4.) In addition to those improvements, the Final Action Plan includes improvements to the oversight and staffing of the inpatient mental health unit, the implementation of policies addressing the

11

screening and referral process for the use of anti-androgens, comprehensive discharge planning for Phase IV residents, modifications to the special needs treatment track, and additional training for clinical staff and housing staff.

Specifically, the Final Action Plan identifies twenty-one "Focus Areas," describes the actions to be taken by the FCCC to address each Focus Area, identifies the title of the DCF/FCCC person responsible for accomplishing the action, identifies a target date by which the action is to be completed, identifies the date the action was or will be completed, and provides miscellaneous comments relating to each focus area. With two exceptions, all of the actions identified for the Focus Areas have been completed; the two remaining areas will be completed by February, 2010.

The parties have agreed that nothing in the Final Action Plan, or any other written document, should be construed as any type of judicially enforceable settlement agreement, injunctive order, or any other type of prospective relief or interpreted as an intent of the parties that there should be continuing jurisdiction of this Court. It is the intent of the parties that approval of the Final Action Plan and dismissal of the case with prejudice will terminate further jurisdiction of this Court.

The Complaint set forth thirteen areas which plaintiffs alleged constituted constitutional violations. The Final Action Plan addresses twelve of these alleged constitutional violations.

A comparison of the Complaint allegations and the Final Action Plan treatment of those matters is as follows:

**(1)    Allegation**: Defendant does not have all four stages of the treatment program design in place, functioning, and available to all residents.    (Doc. #1 at ¶ 141.)

> **Final Action Plan**: Defendant and GEO now have all four phases of the treatment program in operation. (See FCCC Policy and Procedure Manual CL-1, at 13, Doc. #302, App. 6.)  The parties represent that there are currently seven residents in Phase IV, with additional residents scheduled to move up from Phase III to Phase IV in January 2010. (Doc. #302, App. 1, Budz Declaration.)  In addition, since GEO assumed the FCCC contract, 27 residents in Phase IV of treatment have been released by the SVP committing courts.  (<u>Id.</u> at App. 1.)  FCCC has filed reports on two additional residents who reached maximum therapeutic benefit from the program (completion of all treatment phases) and who are awaiting court action.    Defendant also implemented a policy for comprehensive discharge planning for residents and a training program for discharge planning for residents nearing release from the facility. (Doc. #302, App. 7.) Additionally, Defendant implemented a policy outlining expected time frames for progressing through the sex

offender treatment program.  (Doc. #302, App. 6.)

**(2) Allegation**: Defendant does not provide adequate treatment plans for non-participating residents that address the goal of engaging those residents in treatment.  (Doc. #1 at ¶ 142.)

> **Final Action Plan**: This is not addressed in the plan. FCCC has adopted and implemented a policy specifically addressing the issue of engaging those residents who refuse treatment activities.  (Doc. #302, App. 8.) Plaintiffs' counsel determined by review of resident records that this was occurring at FCCC and at the time of settlement negotiations was not an issue.

**(3) Allegation**:  Defendant does not have adequate customs, policies and practices for identifying and assessing residents with developmental disabilities or mental illnesses that impair the effective participation in sex offender treatment.  (Doc. #1 at ¶ 143.)

> **Final Action Plan**: Defendant implemented a policy to identify or assess class members for disabilities that could impact their participation in sex offender treatment.  (Doc. #302, App. 9.)  In addition, Defendant currently notifies the SVP Act committing court of jurisdiction regarding those residents who, because of the severity of their mental illness, may not be able to meaningfully participate in sex offender treatment

programs.  (Doc. #302, App. 10.)

**(4)  Allegation**: Defendant does not have a specialized sex offender treatment program in place for residents with developmental disabilities, learning disabilities, or major mental illnesses which effectively prevent meaningful access and participation in treatment.  (Doc. #1 at ¶ 144.)

**Final Action Plan**: Defendant implemented a specialized sex offender treatment program (Special Needs Treatment Track) to accommodate the needs of class members with developmental disabilities and mental illness whose cognitive impairments hinder their participation in a conventional sex offender treatment program.  (Doc. #302, App. 11.)  Defendant's contractor has worked with nationally-renowned experts James Haaven and Gerry Blasingame in developing and implementing this special program.  (App. 1.)

Additionally, Defendant's policy limits the number of residents in each special track treatment group to no more than 8-10 residents per group with two co-facilitators.  (Doc. #302, App. 6 at 30.)  Defendant provides training and supervision of clinical and housing staff regarding the specific needs of the special track population.  (Doc. #302, Focus Area #19.)  And, although not an issue in the instant case, Defendant provides

specialized services for persons with hearing impairments that do not isolate them with the special track population. (Doc. #302, Focus Area #8; App. 11; ADM-6 attached as App. 12.)

**(5) Allegation**: Defendant does not offer pharmaceutical treatment modalities such as anti-androgens or selective serotonin reuptake inhibitors in the treatment program. (Doc. #1 at ¶ 145.)

**Final Action Plan**: Defendant implemented a policy for screening and assessing all residents for referral for therapeutic sex drive reduction medication, including anti-androgens, and developed training for psychiatrists and clinical staff regarding the screening, assessment and integration of medications, particularly anti-androgens, as a component of treatment. (Doc. #302, Focus Areas ##6, 20; PRG-5 attached as App. 9; HLTH-52 & 53 attached as Apps. 13 & 14.)

**(6) Allegation**: Defendant failed to make adequate provisions for family involvement in treatment rehabilitative efforts. (Doc. #1 at ¶ 146.)

**Final Action Plan**: Defendant's sex offender treatment plan incorporates a program that promotes family involvement at appropriate points in treatment. (Doc. #302, Focus Area #11; App. 4 at 176; App. 6 at 8.)

**(7) Allegation**: Defendant failed to provide an adequate

number of properly trained and certified treatment staff and number of hours in treatment each week. (Doc. #1 at ¶ 147.)

**Final Action Plan**: Defendant developed training to improve communication between clinical staff and housing staff to provide a continuum of care on housing units. (Doc. #302, Focus Area #18.) Additionally, Defendant's contract with GEO provides for 10 hours of treatment per week. (App. 4 at 100.) Based on expert deposition testimony in this case, the 10 hours of treatment is in line with what other similar sex offender treatment programs around the country are providing.

**(8) Allegation**: Defendant is simply warehousing residents, and has not recommended one resident for discharge from the facility based on completion of the treatment program. (Doc. #1 at ¶ 148.)

**Final Action Plan**: The parties report that since GEO assumed operation of FCCC, it has filed 17 formal reports for residents having reached maximum therapeutic benefit from the program (completion of all treatment phases). Fifteen of those residents were released by the SVP committing courts and two are awaiting court action. (Doc. #302, App. 1.) Additionally, Defendant adopted policies for identifying and notifying the SVP committing courts with jurisdiction about residents who may have

difficulty meaningfully participating in the sex offender treatment program, including residents who (a) are incompetent to proceed in the SVP case and are unlikely to be restored to competency; (b) are so severely mentally ill that they cannot participate in the sex offender treatment program as a result of their mental illness; or (c) are terminally ill. (Doc. #302, Focus Areas ##3, 4, 12; App. 10; ADM-13 attached as App. 15; HLTH-98 attached as App. 16.)

**(9) Allegation**: Defendant does not provide adequate individualized service plans for residents. (Doc. #1 at ¶ 149.)

**Final Action Plan**: FCCC has adopted and revised specific policies regarding the development of individual comprehensive care plans for residents receiving treatment. (Doc. #302, App. 10.) In addition, Defendant provides training to FCCC staff to improve individual service plans to include regular updates, more individualized content, and clear objective and measurable goals. (Doc. #302, Focus Area #17; App. 10.)

**(10) Allegation**: Defendant does not employ an adequate number of psychiatric staff to handle the specialized needs of residents with severe mental illness. (Doc. #1 at ¶ 150.)

**Final Action Plan**: Defendant added one additional part-time psychiatrist to its staffing plan for residents

with severe and persistent mental illness. (Doc. #302, Focus Area #14; App. 4 at 83.)

**(11) Allegation**: Defendant does not have sufficient staff to address the daily needs of residents with serious mental illness. (Doc. #1 at ¶ 151.)

> **Final Action Plan**: In addition to increasing the psychiatrist staffing noted above, Defendant now provides a full-time psychiatric nurse on the residential mental health unit. (Doc. #302, Focus Area #16; App. 4 at 83.) Additionally, Defendant provides training to enhance communication between clinical staff and housing staff for continuum of care. (Doc. #302, Focus Area #18.)

**(12) Allegation**: Defendant failed to provide mental health services of adequate frequency, duration, and substance to meet the needs of residents with severe mental illness. (Doc. #1 at ¶ 152.)

> **Final Action Plan**: As noted above, Defendant has increased the level of staffing on the mental health unit by adding a psychiatric nurse and an additional half-time psychiatrist. (Doc. #302, Focus Areas ##14, 16; App. 4 at 83.) Defendant requires GEO to attain full accreditation or outside oversight of the inpatient unit. (Doc. #302, Focus Area #2; App. 4 at 28, 41, 144; CL-10 attached as App. 17.) Additionally, Defendant implemented a policy by which outside consultants review

the records of any resident who has been on the inpatient living unit for more than one year. (See Focus Area #1; App. 17.)

**(13) Allegation**: Defendant does not provide sufficient staff to address the needs of residents with developmental disabilities. (Doc. #1 at ¶ 153.)

**Final Action Plan**: As noted above, Defendant and FCCC have developed and staffed a Special Needs Treatment Track to accommodate the needs of class members with developmental disabilities whose cognitive impairments hinder their participation in a conventional sex offender treatment program. (Doc. #302, App. 6 at 29; App. 11.) In addition, Defendant limits the number of residents in each special track treatment group to no more than 8-10 residents per group with two co-facilitators, (see Focus Area #7; App. 6 at 30), and provides training and supervision of FCCC clinical and housing staff regarding the specific needs of the special track population (Doc. #302, Focus Area #19.)

The Final Action Plan also addresses additional items that were not raised in the Complaint. These include the provision of vocational and work programs, (Doc. #302, Focus Area #10; App. 6), and a process for informing state committing courts of jurisdiction regarding those residents who are terminally ill and may be

appropriate for release from FCCC, (see Focus Area #12; App. 16).

### IV. Application of Principles for Approval of Settlement

With the terms of the Final Action Plan in mind, the Court will apply the legal principles governing whether it should approve the settlement and voluntary dismissal.

### (A) Fraud or Collusion

The threshold issue is the presence or absence of fraud or collusion between the parties. In determining whether there fraud or collusion, the court examines whether the settlement was achieved in good faith through arms-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel. Bennett, 737 F.2d at 987 n.9.

In the instant case, the Court finds that there have been arms-length negotiations and no collusion between the parties and their attorneys. There has been neither unethical behavior nor a want of skill or lack of zeal. The parties negotiated the Final Action Plan after five years of litigation over a five-week period. The negotiations took place by in-person meetings, written correspondence, and conference calls. Plaintiffs consulted their experts throughout the negotiation process. The monies paid to Plaintiffs' attorneys represent reimbursement of out-of-pocket expenses only, and no attorney fees are being paid as part of the

settlement.   This is further evidence of a lack of collusion. Thus, the Court finds the threshold requirement has been satisfied.

**(B)  Fairness, Adequacy and Reasonableness of Settlement**

In evaluating the fairness, adequacy, and reasonableness of the settlement, the Court looks to a non-exclusive list of six basic factors: (1) likelihood of success at trial; (2) range of possible recovery; (3) point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) complexity, expense and duration of litigation; (5) stage of proceedings at which the settlement was achieved; and (6) substance and amount of opposition to the settlement.  <u>Bennett</u>, 737 F.2d at 986.   The Court finds that all factors favor approval of the settlement.

**(1)  Likelihood of Success at Trial**

Courts judge the fairness of a proposed compromise by weighing the plaintiffs' likelihood of success on the merits against the amount and form of the relief achieved in the settlement.  <u>Newberg on Class Actions</u>, at 11-90 (3d ed. 1992).  However, courts are not to decide the merits of the case or resolve unsettled legal questions.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Parker v. Anderson</u>, 667 F.2d 1204, 1209 (5th Cir. 1982) (stating "[i]n examining a proposed compromise . . . the court does not try the case.  The very purpose of the compromise is to avoid the delay and expense of such a trial" [citation omitted]).  <u>See</u> <u>also</u> <u>Cotton</u>, 559 F.2d at 1330 (stating

appropriate analysis is of facts and law relevant to compromise;
court should not try the case nor should court order a proponent of
a proposed settlement to "justify each term of settlement against
a hypothetical or speculative measure of what concessions might
have been gained; inherent in compromise is a yielding of absolutes
and an abandoning of highest hopes" (citation omitted)). Indeed,
a trial court in approving class action settlements has neither the
duty nor even the right to reach any ultimate conclusions on the
issues of fact and law which underlay the merits of the dispute.
Id. at 1330.

Youngberg v. Romeo, 457 U.S. 307 (1982), is the leading case
on the rights of persons confined to institutions. The Court
concluded that an institutionalized mental incompetent "enjoy[ed]
constitutionally protected interests in conditions of reasonable
care and safety, reasonably nonrestrictive confinement conditions,
and such training as may be required by these interests." Id. at
324. There is no doubt that persons involuntarily in institutions
have a substantive due process right to minimally adequate
treatment. That treatment is defined as that which "may be
reasonable in light of [a person's] liberty interests in safety and
freedom from unreasonable restraints." Id. at 322. In determining
reasonableness, courts are required to show deference to a decision
made by a professional judgment, and

> liability may be imposed only when the decision by the
> professional is such a substantial departure from
> accepted professional judgment, practice or standards as

23

to demonstrate that the person responsible actually did not base the decision on such a judgment.

Id. at 323.

The Constitution does not require, however, that residents at FCCC receive optimal treatment and mental health services. Id. at 323. Minimal levels of care are sufficient. Id. Under the professional judgment standard decisions made by trained professionals are entitled to a presumption of correctness, and constitutional violations only exist if there is a substantial departure from accepted professional judgment, practice or standards. Id. Courts can only make certain that professional judgment in fact was exercised and are prohibited from specifying which of several professionally accepted choices should be made. Id. at 321. Consequently, to prove a constitutional violation, Plaintiffs must demonstrate that FCCC's practices and administrative or clinical decisions pertaining to confinement and treatment are such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment. Id. at 323.

The impetus for the litigation arose from Plaintiffs' allegations of constitutionally inadequate conditions at FCCC. Plaintiffs sought to improve the mental health and sex offender treatment to the level required by the professional judgment standard. The evidence clearly establishes that the treatment

provided at FCCC has changed and improved since the case was filed in 2004.

In light of the minimal constitutional standards, Plaintiffs had a genuine concern about proving that the current treatment at FCCC fell below professional judgment standards. For example, a recent court decision in a case against an Illinois sex offender commitment facility found that a similar treatment program did not violate constitutional standards even though the treatment there was not "optimal." See Hargett v. Adams, No. 02-C-1456, 2005 WL 399300, *19-20 (N.D. Ill., Jan. 14, 2005). In addition, after reviewing the expert reports and depositions, Plaintiffs were concerned that the Court might regard Plaintiffs' expert testimony as simply creating a dispute between well-qualified experts over how care should be best provided. See Youngberg, 457 U.S. at 321 (noting that it is "not appropriate for the courts to specify which of several professionally acceptable choices should have been made.").

Thus, the Court finds that the first factor weighs in favor of approval of the parties' settlement plan.

**(2) Range of Possible Recovery**

**(3) Point on or Below Range of Recovery that Settlement is Fair, Adequate and Reasonable**

These two factors can be addressed together for the purposes of applying the standard for approving settlement. See Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 541 (S.D. Fla. 1988)(noting

25

the second and third prongs of <u>Bennett</u> are easily combined).  The range of possible recovery at trial is determined by what Plaintiffs could prove is the constitutional minimum for the provision of sex offender treatment and mental health treatment at FCCC.  It is difficult to gauge the range of possible recovery in an injunctive case for an area of law that is not well-litigated, but the range is limited by <u>Youngberg</u>.  Thus, Plaintiffs reasonably believe Defendant has implemented improvements that are beyond what the Court may have ordered as injunctive relief based on the evidence available at trial.  In the Court's view, this belief is well-founded and reasonable.  Therefore, these two factors support approval of the settlement.

**(4)  Complexity, Expense and Duration of Case**

This factor requires a court to make an educated estimate of the complexity, expense, and likely duration of the trial.  <u>Miller v. Republic Nat'l Life Ins. Co.</u>, 559 F.2d 426, 428 (5th Cir. 1977).  The Court ordered this case to follow Track Three, Local Rule 3.05(b)(3)(M.D. Fla.), for complex cases.  Most class actions are complex, and this case has the added complexity resulting from a class of involuntarily institutionalized persons some of whom have mental health issues and all of whom have been alleged or found to have sex offender issues.  In addition to its complexity, this case is an expensive one.  In preparing the case, Plaintiffs' counsel alone has spent over $250,000 in costs and expenses to cover three

multi-day site visits for their experts, taking 24 depositions around the state and country, and producing tens of thousands of class member records and other documents over the course of litigation. Trial was scheduled to last 10 days. (Doc. #210.) The expense at trial would be further increased because of the number of experts involved on both sides. There is no question that the trial in this case would have been complex, would have required significant expense to the parties, and would have required substantial judicial labor. Therefore, this factor also weighs in favor of approval of the settlement.

### (5) Stage of Proceedings at which Resolution Achieved

The parties agreed on the Final Action Plan more than five years after the filing of the Complaint in the case. This was not a rushed agreement reached in the initial stages of a lawsuit. The parties completed exhaustive discovery over a period of years, both parties were fully prepared for trial, and the settlement is a reasoned resolution of differences. Therefore, the Court finds that this factor weighs in favor of approval of the settlement.

### (6) Substance and Amount of Opposition

There are approximately 700 residents at FCCC. While the number of class members fluctuates, over 350-400 of the 700 residents at the facility are class members. Of that number, only 21 objections from a total of 37 residents were filed during the objection period. Moreover, out of the number of residents filing

objections, only 23 are in fact members of the class. (Doc. #314, Exh. 3.)

At the outset, one objection alleged inadequate notice to the class members of the proposed settlement.[4] Doc. #285, ¶5. As previously discussed, Fed. R. Civ. P. 23(e) requires that the Court direct notice to all class members in a "reasonable" manner. Alabama, 271 Fed. Appx. at 900 (citations omitted). The notice must reach the affected parties and convey the required information. Id. at 901 (citations omitted). In reviewing a notice of proposed settlement to determine compliance with the Due Process Clause, the Court should look "solely to the language of the notices and the manner of their distribution." Id. at 900 (citations omitted). The notice of settlement reached every FCCC resident by hand delivery and postings in the dorms at the FCCC, and contained clear language advising all parties of the proposed settlement. See supra at 6-7 (discussing method of providing notice in this case). Thus, the Court finds the notice provided in this case was reasonable.

The most substantive objection concerned the lack of a federal monitor or court oversight. (See Docs. #280, ¶2; #282; #283; #284; #296, ¶6.) The Court finds there are sufficient means of monitoring the quality of care provided at FCCC to compensate for the lack of federal or court oversight. First, Defendant requires

_____

[4]The objector raising the issue of notice is not a member of the class action. Doc. #314, Exh. B.

GEO to achieve full accreditation and oversight of the inpatient unit through CARF accreditation. (Doc. #302, Focus Areas ##1 & 2.) The Commission on Accreditation of Rehabilitation Facilities (hereinafter "CARF") is an independent organization that inspects and accredits treatment facilities. To be accredited, the facility must meet CARF standards and pass a site inspection by surveyors. Second, the Defendant actively engages in contract monitoring with GEO. (Doc. #302, App. 4 at 28, 38-9.) Second, all aspects of the program are subject to all state contractual monitoring requirements. Third, GEO contracts with the TAB and other expert consultants. These individuals, nationally-renowned sex offender treatment providers, review policies and procedures, visit the facility, provide training to staff members, and provide suggestions for improved treatment modalities. (Doc. #302, App. 1.) Fourth, for residents with severe and persistent mental illnesses, the Defendant requires the review of any resident housed for more than a year on FCCC's mental health unit by an outside clinical team. (See Focus Area #1; App. 17.) Finally, Plaintiffs' counsel continues to monitor the provision of services at the facility. As recently as September 29, 2009, Plaintiffs' counsel visited the facility where they interviewed residents and reviewed treatment records. Any time Plaintiffs' counsel alerted to any treatment-related issues, counsel contacted counsel for Defendant and Defendant's counsel then relayed the information to Defendant and GEO. Plaintiffs' counsel received a swift response from both

Defendant and GEO regarding any issues brought to their attention.

Some of the objections were overly vague, such as, requesting "more meaningful or adequate treatment." (Doc. #275.) Other objections pertained to matters unrelated to the Complaint. (Doc. #288 (complaining, *inter alia*, about being included as a class member).) At least one of the objections contained allegations more appropriate for filing in a petition for writ of habeas corpus. (Doc. #288.)

Finally, some objectors want more relief than was encompassed by the allegations in the Complaint. (<u>See</u> Doc. #277 (complaining of conditions of confinement at the new facility).). Those objections are outside the scope of the constitutional violations alleged in the Complaint or are outside the scope of what Plaintiffs' attorneys thought they could establish as a constitutional minimum at trial. Their general dissatisfaction with the resolution of the case does not mean the resolution is not fair, adequate, and reasonable under the circumstances. <u>See</u> <u>Perez v. Asurion Corp.</u>, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007) (holding objectors wanting a "better deal" than provided in the settlement did not warrant rejecting the final settlement plan when weighed against the Bennett factors and the judgment of class counsel).

**(C)  Judgment of Experienced Class Counsel**

Attorneys for both Plaintiffs and Defendant have decades of

class action litigation experience.  Under such circumstances, both sides can evaluate the case in light of a complete understanding of the strengths and weaknesses of their side.  A court "should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation, and a presumption of correctness is said to attach to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery."  Manual for Complex Litig., § 30.41 (2d Ed. 1985); see also Cotton, 559 F.2d at 1330; Lelsz v. Kavanagh, 783 F. Supp. 286 (N.D. Tex. 1991), aff'd, 983 F.2d 1061 (5th Cir.).

The parties have actively litigated this case for more than five years.  After carefully considering the claims, the state of the law, and the evidence, all counsel believe that this agreement represents a fair and reasonable resolution to Plaintiffs' claims. These opinions should be considered in light of their "length of involvement in the litigation, competence, experience in the particular type of litigation, and the amount of discovery completed."  Newberg on Class Actions, ¶ 11.47 (1992 Supp.).

Over the five-year course of this litigation, Plaintiffs' attorneys expended nearly one million dollars of compensable attorney time and litigation expenses.  Defendant agreed to pay Plaintiffs' counsel $249,000.00 as payment of Plaintiffs' out-of-pocket litigation expenses.  This amount includes items such as the payment of experts, deposition costs, and other costs associated with the prosecution of the case.  This amount is the

31

only compensation to be paid to Plaintiffs' counsel and they have agreed not to seek an award of fees and costs from the court.

ACCORDINGLY, it is hereby

**ORDERED**:

1.  The Joint Motion for Approval of Settlement and Dismissal of the Case (Doc. #302) filed by Plaintiffs and Defendant is **GRANTED**. This case is dismissed with prejudice.

2.  Defendant **must** provide notice to the FCCC residents regarding approval of the settlement and dismissal of this action **on or before December 2, 2009**, by utilizing the same methods previously ordered by the Court in its September 14, 2009 Order. On or before **December 7, 2009**, an FCCC official shall file an affidavit confirming that every resident at the facility was given notice of the approval of the settlement and dismissal of this action.

3.  The Clerk of Court shall enter judgment accordingly, terminate any pending motions, and close this case.

**DONE AND ORDERED** in Fort Myers, Florida, on this __23rd__ day of November, 2009.

JOHN E. STEELE
United States District Judge

Copies:
All Parties of Record